IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK
_____

| | |
|---|---|
| UNITED STATES OF AMERICA | 14-CR-6149EAW |
| -vs- | UNITED STATES' POST-HEARING |
| WILLIE HARRIS, | MEMORANDUM OF LAW |
| Defendant. | |

_____

The United States of America, through its attorney, William J. Hochul, Jr., United States Attorney for the Western District of New York, Charles E. Moynihan, Assistant United States Attorney, of counsel, does hereby make and file its post-hearing memorandum of law.

## PROCEDURAL HISTORY

The defendant, Willie Harris, currently stands indicted in a multiple-count indictment charging him with a firearms and controlled substance possession offenses stemming from his possession of a shot-barreled shotgun and cocaine on June 10, 2014. Harris in his omnibus motions has moved to suppress certain evidence and statements as outlined below. The Court held an evidentiary hearing on January 30, 2015, in which the defense called Sabastian Dimaggio to testify. The government called Geetha Vijay and Federal Bureau of Investigation Special Agent Barry Couch to testify at the hearing.

For those reasons stated below, the United States opposes Harris' various motions to suppress. If not specifically stated, the United States generally opposes all requests of Harris related to these motions.

## FACTS

Harris lived at 49 Troup Street, Apartment 21, Rochester, New York, on June 10, 2014. On that day, law enforcement executed a New York State court search warrant at his residence, permitting the seizure of evidence related to a human trafficking investigation which they were conducting. While searching the apartment, law enforcement secured, among other things, cocaine and a short-barreled shotgun. Harris spoke with law enforcement about the human trafficking investigation and about these items, ultimately providing Couch and Rochester Police Department Investigator Brian Tucker with a written statement. In short, he admitted to selling the cocaine and to possessing the short-barreled shotgun.

Prior to June 10, 2014, Couch investigated claims by a minor that Harris had "prostituted her out here in the City of Rochester." (Record at 58.) On June 5, 2014, Couch and Tucker went to 49 Troup Street to speak with Harris about the allegations. (Record at 58-60.) When they arrived, they were met by Geetha Vijay, the property manager, who also was part owner of the property. (Record at 41, 43, 60.) She let Couch and Tucker inside of the building because the outer door was locked. (Record at 41, 60.) Couch and Tucker introduced themselves to Vijay and said that they were there to speak with Harris. (Record at 47, 60.) Couch and Tucker showed her a photographic array

2

containing a picture of Harris, asking if she knew who he was. (Record at 60.) Vijay told them that the person in the photograph was Harris and that he was the only resident of apartment 21. (Record at 60-61, 81.)[1] Vijay said that she did not think that Harris was home, but directed Couch and Tucker to Harris' apartment. (Record at 47.) Couch and Tucker went to speak with Harris but found he was not home. (Record at 61.)

They returned to Vijay, who introduced them to DiMaggio, the building superintendent. (Record at 4, 61.) DiMaggio happened to be nearby and Vijay called him over to speak with Couch and Tucker. (Record at 48.) She stayed with DiMaggio "for a period of time" as he spoke with Couch and Tucker. (Record at 64.) Couch and Tucker introduced themselves to DiMaggio and said why they were there – that they were looking for Harris and that they were wondering if DiMaggio had ever seen Harris with a girl. (Record at 49, 65.) Couch testified:

> [T]here was an allegation that Mr. Harris was prostituting out minor-age females or at least one out of that apartment. And I immediately followed that up with a couple of questions to Mr. DiMaggio and asked him if he had seen a lot of men coming to the apartment, and he said that he had. And then I asked him had he seen Mr. Harris with young girls, and he said that he had. And then on his own, he volunteered, it's my recollection that he volunteered at that point that Mr. Harris had actually propositioned a young looking 15-year-old girl to him outside of the apartment complex.
>
> Record at 65.

---

[1] At the time of the suppression hearing, on January 30, 2015, Vijay testified that she could not remember whether Couch and Tucker showed a photographic array containing a photograph of Harris. (Record at 47, 51, 52.)

3

DiMaggio added that "it was disgusting," or that "it is disgusting," immediately after he told Couch and Tucker this and said that Harris "offered up the girl to him or anybody else he knew." (Record at 66-67.) Couch "wonder[ed] if [DiMaggio] ha[d] a problem saying this in front of his boss, Ms. Vijay, because she [was] still standing there." He felt a little uncomfortable for DiMaggio. (Record at 67.) Vijay, who was "shocked" at learning of this, was standing with Couch, Tucker and DiMaggio during this but left the conversation at some time after this. (Record at 50, 67.)

At some point during the conversation with DiMaggio, Couch and Tucker displayed a photographic array containing a photograph of Harris. (Record at 70-71.) DiMaggio, when prompted to look at the photograph of Harris, said that the person looked like Harris. Before this, he said that a person depicted in another photograph looked familiar. (Record at 71.)

Several hours after this conversation, Couch and Tucker returned to 49 Troup Street with a photograph of a girl whom they believed to be the one DiMaggio with Harris. (Record at 68-69.) They went to DiMaggio's apartment and showed him the photograph. While he could not be one hundred percent certain, DiMaggio thought it was the same girl and said that the girl he saw had longer hair and looked a little dirtier. (Record at 69, 89.) Vijay was not present during this conversation. (Record at 69.)

However, later that same day, after DiMaggio spoke with Couch and Tucker while Vijay was present, Vijay confronted DiMaggio about not telling her about Harris

4

approaching DiMaggio with the girl. (Record at 51, 55.) She made it clear to DiMaggio that they could not permit this sort of thing to happen in the building. (Record at 51.)

Couch then prepared a search warrant and search warrant application requesting authorization to search apartment 21 at 49 Troup Street. (Record at 71-72.) In paragraphs, 13, 14 and 15 of the application, Couch summarized the information he and Tucker received from Vijay and DiMaggio on June 5, 2014, which is described above. (Record at 73-75.) Couch did not include information regarding the photographic array which he showed DiMaggio on June 5, 2014. (Record at 76, 88.) Further, he did not include information about how the girl whom Harris had offered to DiMaggio had at first said that another person depicted in the array "look[ed] familiar" and that this happened prior to identifying Harris as her pimp when viewing a photographic array including a photograph of Harris. (Record at 78-79.)

DiMaggio, who testified on behalf of Harris, said that he did not recognize the girl who was depicted in the photograph shown by agents, and that he recognized Harris in the photographic array only after agents pointed to Harris' photograph and asked specifically about it. (Record at 5.) He told law enforcement that he saw a white girl in the apartment building and that he had seen a white girl with Harris one time. (Record at 8, 10.) He said that he told law enforcement the girl, not Harris, asked him if he wanted to "party or something." (Record at 8.) But, he later said that, while it would have been a mistake, he could have told Couch and Tucker this on June 5, 2014. However, he did not remember saying it. (Record at 9, 11, 12-13, 20, 26.) He remembered Vijay not being present for any

5

conversation he had with law enforcement. (Record at 14.) DiMaggio denied telling law enforcement that he had seen men appear to be going to Harris' apartment. (Record at 16-17, 25.) DiMaggio testified that he may have described the girl as a young looking, white girl. (Record at 26-27.) He also testified that he did not recall telling law enforcement that Harris was angry when the girl left. (Record at 27-28.)

## SUMMARY OF ISSUES

I.  Whether the defense has shown that the search warrant affidavit intentionally or recklessly contains false material information or omissions.

## ARGUMENT

**I.  The defense has failed to show that the search warrant affidavit intentionally or recklessly contains false material information or omissions.**

A. **Legal Standard**

Reviewing courts will evaluate this Court's conclusions of law under a de novo standard of review and under a clear error standard as to findings of fact. Pierce v. Underwood, 487 U.S. 552, 558 (1988).

"Ordinarily, a search or seizure pursuant to a warrant is presumed valid. In certain circumstances, however, a defendant may challenge the truthfulness of factual statements made in the affidavit, and thereby undermine the validity of the warrant and the resulting search and seizure." United States v. Awadallah, 349 F.3d 42, 64 (2d Cir. 2003) citing Franks v. Delaware, 438 U.S. 154, 164-72 (1978). A defendant wishing to invoke the Franks doctrine must show that an affidavit contained intentional and material misrepresentations or omissions. Awadallah, 349 F3d at 64. The Court may hold such a hearing when it determines that the defense has made a substantial preliminary showing: (1) that the warrant affidavit includes a false statement; (2) that the allegedly false statement was made knowingly and intentionally or with reckless disregard for the truth; and (3) that the allegedly false statement is necessary to a finding of probable cause. See Franks v. Delaware, 438 U.S. 154 (1978). Further, in order to prevail in a suppression motion on these grounds, '[T]he defense must show: "(1) the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth; and (2) the alleged falsehoods or omissions were necessary to the [issuing] judge's probable cause finding."' Canfield, 21 F.3d at 717-18 (2d Cir 2000) quoting United States v. Salameh, 152 F.3d 88, 113 (2d Cir. 1998). The court considering such a motion should apply this framework upon conducting the Franks hearing. See United States v. Tzraska, 111 F.3d 1019, 1027-28 (2d Cir. 1997).

"'A misrepresentation or omission is intentional when "the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth."' Awadallah, 349 F3d at 64 citing United States v. Canfield, 212 F.3d 713, 717-18

7

(2d Cir. 2000). 'It is material when "the alleged falsehoods or omissions were necessary to the [issuing] judge's probable cause finding."' Awadallah, 349 F3d at 64-65 citing United States v. Canfield, 212 F.3d 713, 717-18 (2d Cir. 2000).

However, after the hearing, the Court must adhere to the fundamental underpinning that statements which result from negligence or innocent mistake are insufficient to justify a declaration that a search warrant was defective. Franks, 438 U.S. at 171. Further, Franks does not require that all statements in an affidavit be true; it simply requires that the statements be "believed or appropriately accepted by the affiant as true." United States v. Campino, 890 F.2d 588, 592 (2d Cir. 1989), cert. denied, 498 U.S. 866 (1990) citing Franks v. Delaware, 438 U.S. 154, 165 (1978).

### B. Argument

First, the defense has failed to show that the affidavit supporting the search warrant contained false information. The defense appears to argue that three essential facts placed in the search warrant affidavit are false. First, the defense argues that DiMaggio did not say he saw men appearing to come to apartment 21. Second, the defense argues that DiMaggio never said he saw Harris with a young-looking girl. Finally, the defense argues that DiMaggio did not say that Harris offered a young girl to him.

The weight of the evidence, that is the testimony of both Couch and Vijay, compels the Court to find to the contrary. Couch described how he and Tucker went to 49 Troup

Street to investigate allegations that Harris was prostituting young girls out of that location. (Record at 58.)  He and Tucker spoke with DiMaggio.  DiMaggio told him that he had seen men going to the apartment.  (Record at 65.)  Couch testified that DiMaggio told him and Tucker that he had seen Harris with young girls.  (Record at 65.)  Couch recalled that, at this time, DiMaggio "volunteered" that Harris had offered a young-looking "15-year-old" girl for sex and that this happened outside of the apartment complex.  (Record at 65.)  Later, Couch placed DiMaggio's information in an affidavit supporting a search warrant for 49 Troup Street, Apartment 21.  (Record at 73-75.)

As if the oath to tell the truth upon offering testimony was not enough for the Court to find Couch truthful in his testimony regarding his encounter with DiMaggio on June 5, 2014, the search warrant affidavit, which was received by the Court as Government's Exhibit 2, bearing a similar promise, reinforces the fact that Couch's testimony about Harris' information was truthful.  The search warrant affidavit says that Couch swore to the truth of the contents of the affidavit before the issuing magistrate, United States Magistrate Judge Marian W. Payson.  (Government's Exhibit 2, page 9 (bearing Bates Stamp number Rule_16_Dscv_076).)

However, the evidence supporting Couch's testimony is more than this.  Vijay testified that she was present for a good portion of the first meeting between DiMaggio, Couch and Tucker.  Aside from stating that she remembered the meeting between Couch, Tucker and DiMaggio, Vijay recalled being mortified upon learning that Harris had propositioned a young girl to DiMaggio or any of his friends.  While she could not recall all

9

of the details of the meeting, such as the exact date of the meeting, she did remember DiMaggio saying he saw Harris with a young "woman," that he could not recall exactly when, that DiMaggio 'said, "[Harris] was pimping her" and that DiMaggio told Couch that Harris had approached DiMaggio about the girl. (Record at 49-50.)

     Couch's version of events, which is supported by Vijay's testimony, is credible. Couch's answers were candid and marked by specific detail. Likewise, Vijay was candid in her answers, offering facts when she could and admitting when she could not remember. Further, Vijay never said that the events later testified to by Couch did not happen. Rather, she described in her own words how some of those events occurred and that she could not remember about others. For example, Vijay did not say that Couch never showed her a photographic array containing a picture of Harris, as the defense argues in its post-hearing memorandum of law. (<u>See</u> Post-Hearing Supplemental Submission Regarding Motion to Suppress, Document 24, dated 4/06/15, page 8.) Rather, during direct examination, Vijay was equivocal as to this issue. However, during cross examination, she was clear that she did not remember. (Record at 47, 52.) Couch, for his part, was clear in his testimony that he did show such an array to Vijay and that Vijay told him she knew the person to be Harris and that he resided in Apartment 21. (Record at 60-61.)   Also, Couch's testimony and Vijay's testimony, when compared, agree in that they both describe the same event, albeit from different perspectives. This adds another level of credibility to the testimony of both witnesses.

In contrast, DiMaggio's testimony is marked by lapses in memory, admitted mistakes and is often contradictory. The Court should accord little weight to DiMaggio's testimony in so far as it contradicts that of Couch and Vijay. While, DiMaggio denied ever telling Couch that he saw men in or going to Harris' apartment, (Record at 16-17, 25,) he readily admitted that he could not recall what he said to Couch and Tucker numerous times. (Record at 11, 12, 13-14, 20, 23, 27-28.) To add to the confusion in his testimony, DiMaggio contradicted himself. DiMaggio, at first testified that he never told Couch *Harris* offered a girl for sex. (Record at 8.) However, DiMaggio later said that he could have told Couch that Harris offered the girl to him and his friends, but qualified that it would have been incorrect or mistaken. (Record at 9, 11, 12-13, 20, 26.) He also said, in a third version of events, that girl he saw with Harris asked him if he wanted to "party." (Record at 8-9.) He may have been confused about whether Harris was offering the girl to him for sex, or if it was the girl herself. Either way, under this construction of the facts, DiMaggio received the offer when Harris was present. The reasonable interpretation of this event is that DiMaggio believed that Harris was with the girl and told Couch about this incident, as Couch described in the affidavit. Finally, during direct examination, DiMaggio admitted that he told Couch that he saw Harris with a "white girl" one time. (Record at 7-8, 10, 26.) This is consistent with Couch's statements in the search warrant affidavit.

Second, any omissions from the search warrant affidavit did not mislead the issuing magistrate. The defense argues that Couch should have included information regarding the photographic identifications of Harris by DiMaggio and Cooperating Witness #1. According to the defense, failing to include this information was misleading as to probable

cause to search Apartment 21. However, inclusion of the identification of Harris by Cooperating Witness #1 in the affidavit would have supported the probable cause underpinning the search warrant. According to Couch, Cooperating Witness #1 was clear that the person depicted in the photographic array looked like a person she called "Pitbull," which was her name for Harris. (Record at 78-79.) Further, the identification of Harris by DiMaggio was not questionable because DiMaggio knew Harris. He admitted as much during his testimony and told this to Couch when he saw Harris' picture. (Record at 4-5, 18, 24-25.) Placing this identification in the search warrant affidavit would likewise add to the probable cause supporting the search of Apartment 21. Finally, the identifications which the defense argues should have been included in the affidavit are more aptly applied to the question of whether there is probable cause to believe that Harris committed a sex trafficking offense involving Cooperating Witness #1. They are, as Couch believed, unnecessary to give rise to probable cause given the already abundant evidence in the search warrant affidavit.[2]

Finally, even if the defense has succeeded in showing the presence of intentional or reckless false statements in the search warrant affidavit, or that alleged omissions are misleading, which the government in no way concedes, any such statements or omissions are not material to any finding of probable cause. The search warrant, without the claimed

---

[2] Even if the Court finds that the defense has failed to carry its burden under Franks v. Delaware, 438 U.S. 154 (1978), and finds the information in the affidavit to be truthful, but still finds in its review that the search warrant affidavit lacks probable cause, the government believes that the executing law enforcement officers properly and in good faith relied upon the search warrant and that suppression of the evidence seized from 49 Troup Street, Apartment 21, in connection with the search warrant, as well as Harris' statements to law enforcement, is not the appropriate remedy. See United States v. Leon, 468 U.S. 897 (1984).

erroneous information, still contains sufficient information to render the search warrant supported by probable cause. Couch presented specific details regarding criminal activity involving "Shawn," who was later identified as Harris, and Cooperating Witness #1 in paragraphs 5 through 10 of the Affidavit in Support of A Search Warrant. In short, Cooperating Witness #1, who was at the time a sixteen year old female, said "Shawn" arranged for her to prostitute for him. Cooperating Witness #1 engaged in sexual acts with multiple men in exchange for payment, which "Shawn" kept. This happened at hotels, houses and at 49 Troup Street, Apartment 21. "Shawn" advertised through telephone chat lines while Cooperating Witness #1 would speak with potential clients by using chat lines and would "provide another phone number for the client to call and make the prostitution date arrangements." (Government's Exhibit 2, pages 5-7 (bearing Bates Stamp number Rule_16_Dscv_072-074).) Couch said he inspected the mailbox for 49 Troup Street, Apartment 21, and saw "Willie Harris" printed on it. (Government's Exhibit 2, page 7 (bearing Bates Stamp number Rule_16_Dscv_074).) Independently, the search warrant affidavit would still contain probable cause without the contested information.

## CONCLUSION

Given the government's position articulated above, that is the search warrant was supported by truthful information amounting to probable cause, all government action in this case was lawful. As such, the seizure of the evidence from 49 Troup Street, Apartment

21, as well Harris' statements, were the product of lawful police conduct.  The Court should deny the defense motion for suppression.

Dated:   Rochester, New York, April 10, 2015

        WILLIAM J. HOCHUL, Jr.
        United States Attorney

    By:   s/CHARLES E. MOYNIHAN
        Assistant United States Attorney
        United States Attorney's Office
        100 State Street, Suite 500
        Rochester, New York  14614
        (585) 399-3971
        Charles.Moynihan@usdoj.gov


To: Steven Slawinski, Esq.